494 F.2d 575
 UNITED STATES of America, Plaintiff-Appellant, William P.
Thompson et al., Intervenors-Appellants, Patsie
Primm, as next friend of Bobbie Lewis
Knight, et al., Intervenors,
v.
WILCOX COUNTY BOARD OF EDUCATION et al., Defendants-Appellees.
 Nos. 71-3018, 73-3543.
 United States Court of Appeals, Fifth Circuit.
 May 2, 1974, Rehearing and Rehearing En Banc Denied June 7, 1974.
 
 Charles S. White-Spunner, U.S. Atty., Mobile, Ala., Elliott L. Richardson, U.S. Atty. Gen., J. Stanley Pottinger, Asst. U.S. Atty. Gen., Brian K. Landsberg, John R. Scott, Attys., Dept. of Justice, Washington, D.C., for plaintiff-appellant.
 A. F. Cooper, Prichard, Ala., Jack Greenberg, Norman J. Chachkin, New York City, for Thompson and others.
 W. McLean Pitts, Selma, Ala., T. W. Thagard, Montgomery, Ala., L. Y. Sadler, Jr., Camden, Ala., William J. Baxley, Atty. Gen. of Ala., Gordon Madison, Asst. Atty. Gen., Montgomery, Ala., for defendants-appellees.
 Solomon S. Seay, Jr., Montgomery, Ala., for other interested parties.
 Before THORNBERRY, MORGAN and CLARK, Circuit Judges.
 PER CURIAM:
 
 
 1
 Litigation with regard to the Wilcox County, Alabama school system began in November of 1965. At that time, the then totally segregated system enrolled 4300 black and 1500 white children. The latest semi-annual report of the Wilcox County School Board (School Board) discloses that at the opening of the Fall 1973 session the system enrolled 3,733 black and 109 white students.[1] All but four of the white students in the system now attend Wilcox County High School. The system's subsequent history discloses a rapidly declining white enrollment. Economically the county is among the nation's poorest, and some of the impediments to achieving a unitary school system are directly attributable to fiscal disabilities under a system of financing in which declining enrollment and lack of local effort reduce state funding. The present appeal was initiated by the United States, the original plaintiff in the litigation, after the district court's order and report dated September 26, 1973. The United States urges error in the district court's imposition of a minority to minority transfer policy, its refusal to implement the plan submitted by the Title IV Center of the University of South Alabama (Title IV Center) insofar as this plan called for the consolidation of the formerly all-white and all-black schools in the Camden attendance area, and the court's refusal to create a countywide Advisory Committee.
 
 
 2
 An appeal has also been taken by the plaintiff-intervenors (a group comprised of national churchmen, teachers students and parents of students in the school system). These intervenors raise the same three contentions as are advanced by the United States. In addition, they urge as error the district court's failure to order back pay relief for certain defense and emergency certified teachers whose contracts were not renewed, the refusal to adopt the Title IV Center's transportation plan, the failure to require immediare action to accomplish the matters covered in our mandate of January 10, 1972, the failure to prohibit the charging of janitorial fees to students, the refusal on financial grounds to order full implementation of the Title IV Center plan and to appoint a receiver, the failure to adopt findings of fact and conclusions of law, the failure to require the defendant Alabama State Department of Education to provide professional and economic assistance to the School Board and the postponement of the entry of an order requiring the payment of legal fees to the attorney representing the intervenors.
 
 
 3
 These appeals were collectively docketed as Cause No. 73-3543 and were consolidated with the prior and still pending appeal, Cause No. 71-3018. This court held a prehearing conference pursuant to FRAP 33. Subsequently the parties filed supplemental briefs and reached agreement on the issue of attorneys' fees; this issue has now been resolved and is embodied in a decree of this court entered on February 25, 1974.
 
 
 4
 On March 7, 1972 the district court entered an order pursuant to this court's mandate of January 10, 1972 which directed the School Boars to:
 
 
 5
 (1) desegregate the faculty and staff of the district pursuant to Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1970);
 
 
 6
 (2) institute majority to minority transfer and notice provisions pursuant to Ellis v. Board of Public Instruction of Orange County, Florida, 423 F.2d 203 (5th Cir. 1970);
 
 
 7
 (3) reexamine and, if necessary, reconstitute, the district's transportation system pursuant to Singleton, supra;
 
 
 8
 (4) adopt policies covering construction, site selection and student transfers pursuant to Singleton, supra;
 
 
 9
 (5) file semi-annual reports as required by United States v. Hinds County School Board, 433 F.2d 611 (5th Cir. 1970); and
 
 
 10
 (6) report to the district court by March 30, 1972 as to Items (1), (2) and (3).
 
 
 11
 On October 5, 1972 a consent order was entered which stipulated documents and testimony of teachers and ordered the School Board to:
 
 
 12
 (1) achieve accreditation in every district school where financially possible;
 
 
 13
 (2) request the Title IV Center to evaluate the system and make recommendations as to accreditation;
 
 
 14
 (3) assure that school children get textbooks made available by the State Department of Education;
 
 
 15
 (4) cease charging $7.50 per semester to students for janitorial service;
 
 
 16
 (5) institute the teacher and staff criteria set out in United States v. Texas Education Agency (La Vega School District), 459 F.2d 600 (5th Cir. 1972);
 
 
 17
 (6) reinstate 16 named teachers with back pay;
 
 
 18
 (7) consider under non-racial criteria the entitlement to reinstatement of 14 defense and emergency certified teachers but without back pay unless the court so orders;
 
 
 19
 (8) report by November 10, 1972 on all teacher actions.
 
 
 20
 The State Department of Education was ordered to assist in achieving accreditation and report to the court thereon. On this same date the court advised the parties in open court that further noncompliance by the School Board with the spirit and intent of its orders would result in the issuance of a contempt citation.
 
 
 21
 On May 15, 1973 the court entered an order requiring the School Board to properly administer all phases of the Title I program. In a separate order of the same date it enjoined the School Board, as to traditionally black schools in the system, to:
 
 
 22
 (1) upgrade deficient facilities according to the recommendations of the Title IV Center;
 
 
 23
 (2) maintain adequate sanitation in restrooms;
 
 
 24
 (3) keep buildings in minimum repair;
 
 
 25
 (4) protect students from and adequately ventilate open heating stoves.
 
 The School Board was further ordered to:
 
 26
 (a) remove from the records of all black students entries reflecting their expulsion for attempts to enroll at Wilcox County High School and assist such students to make up time and credits lost due to expulsion;
 
 
 27
 (b) develop a uniform student disciplinary code;
 
 
 28
 (c) end racial discrimination against students as to service, facilities and extra-curricular activities; and
 
 
 29
 (d) end racial discrimination as to parents and the public in school-related matters, graduation exercises, athletic activities and parent-teacher meetings.
 
 
 30
 The State Board of Education and the State Superintendent of Education were ordered to comment on the educational desirability of implementing the school plan originated by the Department of Health, Education and Welfare. Finally, the court ordered the School Board to:
 
 
 31
 (1) maintain Singleton faculty ratios while accommodating teachers, schools and minimizing the hardships of reassignment;[2]
 
 
 32
 (2) keep records of all student transfers out of the system;
 
 
 33
 (3) maintain inventories of additional materials;
 
 
 34
 (4) act wherever possible to reduce teacher-pupil ratios, and
 
 
 35
 (5) supplement the Board's semi-annual reports with special information on the items covered by the concluding portions of this order.
 
 
 36
 On September 26, 1973 the district court entered an order and report, expressly in response to our January 10, 1972 mandate, which required the establishment of a 12-grade school at Camden Academy and a separate 12-grade school within the same attendance area at the Wilcox County High School facility. The remaining recommendations of the Title IV Center report filed on June 28, 1973 relating to school district consolidations and pupil assignments were adopted by the court. The School Board was ordered annually to file copies of its operating budget and property inventory with the court. School principals were ordered to account properly for funds. The School Board was prohibited from making capital expenditures without prior court approval. The School Board was ordered to:
 
 
 37
 (1) report new funds and fund sources to the court;
 
 
 38
 (2) make teacher assignments pursuant to Singleton;
 
 
 39
 (3) provide janitorial service, maintenance and upkeep for each school;
 
 
 40
 (4) adopt the Title IV Center's suggested Handbook of Student Rights;
 
 
 41
 (5) evidence its overall intent to comply with all Title IV Center recommendations, except as to Camden area consolidations and as to the creation and utilization of a countywide advisory council.
 
 
 42
 The order prohibited the introduction of dogs or weapons upon school campuses, and enjoined all parties to seek outside financial assistance for the system and pretermitted ruling on attorneys' fees.
 
 
 43
 THE MAINTENANCE OF DUAL SCHOOLS IN THE CAMDEN AREA AND THE INSTITUTION OF A MINORITY TO MINORITY STUDENT TRANSFER POLICY
 
 
 44
 The district court, in the face of a preponderant black student majority and a white student exodus, sought to preserve some semblance of racial integration by permitting the relative handful of white students to elect to concentrate themselves in a formerly all-white facility-- the Wilcox County High School. To accomplish this the court established parallel educational institutions at Camden Academy and at Wilcox County High School, both located within a mile of each other in the Camden attendance area, and by permitting the privilege of transfer to white students only. Such an approach is not without some precedent. See, Singleton, supra, 419 F.2d at 1221 (St. John the Baptist Parish, Louisiana). In this case this court, en banc, found it unnecessary to require the division of a small number of minority whites amongst five schools in one portion of a predominantly black school system. However, neither the physical situations of the two school districts nor the remedies utilized by the court there and here are sufficiently similar to warrant affirmance. St. John the Baptist Parish is divided by the Mississippi River. Its East bank schools were operated by the district on an integrated basis. The district court permitted West bank students to exercise freedom of choice in selection the school they wished to attend. In contrast, the record here indicates that the Wilcox County School Board has yet to demonstrate objectively its will to operate this system in a manner calculated to remedy past discriminatory practices and achieve unitary status. In Wilcox County, the minority to minority transfer provision imposes a condition which is racially biased in every respect except literal appellation. If and when this School Board removes itself from the shadow of contempt, the district court may then consider whether a racially neutral freedom of choice plan could be of benefit in bringing about a unitary system. Because that day has not yet arrived, the district court erred in rejecting the general concept of the plan submitted by the Title IV Center for the consolidation of the Camden area schools, and in adopting a minority to minority transfer provision. There portions of the order appealed from are reversed. The district court is directed to implement the Title IV Center recommendations for Camden area schools effective at the commencement of the Fall 1974 school term.
 
 COUNTYWIDE ADVISORY COUNCIL
 
 45
 Believing that the school system was 'over-committeed' and seeing no benefit from the creation of another school-related group, the district court rejected the Title IV Center's recommendation for the creation of an advisory committee drawn from the entire county. This court is advised that each school is now served by trustees who, under Alabama law, represent the interests of the school in general and who deal with the School Board in general matters regarding their particular school. Most, if not all, of the schools in the system also utilize the traditional parent-teacher organizations, which also function on an individual school basis. The record evidence of poor relationships and lack of communication between teachers, students and their parents on the one hand and the School Board on the other, of open official encouragement of whites to frustrate unitary goals, and the fact that the district court considered it necessary to enjoin the School Board to permit the non-discriminatory function of parent-teacher associations as late as May of 1973, all operate to persuade this court that school trustees and parent-teacher organizations are not viable substitutes for a system-wide group chosen by the court to affect liaison between the community, school officials and the court in the manner prescribed in Singleton, Ellis and Hinds County, supra. The district court is directed to create such a group promptly upon the remand of this case. Should the district court determine that the type of committee envisioned in the recommendation of the Title IV Center would be superior to a typical biracial committee, it may choose to implement that portion of their plan.
 
 
 46
 STATUS OF DEFENSE AND EMERGENCY CERTIFIED TEACHERS
 
 
 47
 This issue raised by the intervenors was initially dealt with by the district court's decree of October 5, 1972. The United States represents that it was subsequently the subject of correspondence from the court to counsel on April 20, 1973, and that, on August 22, 1973, it filed a memorandum containing certain financial information in compliance with the court's request. The parties are presently under a directive from the district court to prepare an additional consent decree on this issue. The matter is one which should be resolved by the district court in the first instance. We do, however, note that the United States continues to contend that six other black teachers were discriminatorily dismissed in November 1971. We are confident that the entire area of discriminatory teacher and staff dismissals and pay entitlement, which was a matter covered by our 1972 remand, will have the careful attention of the district court. We decline to require the entry of any specific order on this matter in the present appeal.
 
 THE TITLE IV CENTER'S TRANSPORTATION PLAN
 
 48
 In its order of March 7, 1972 the district court expressly ordered the reexamination and reconstitution of the School Board's transportation system under Singleton, supra. In its order of September 26, 1973 it clearly indicated approval of the concepts contained in the Title IV Center plan and provided that compliance with the court's mandate would be measured by the amount of implementation of the Title IV Center plan which the School Board could achieve. As with teacher and staff discrimination problems, solution of the complex problems interwoven into the creation and operation of an efficient non-discriminatory transportation system for Wilcox County schools must be the responsibility of the district court in the first instance.
 
 
 49
 FIXING SPECIFIC TIMES FOR ACCOMPLISHMENT OF DESEGREGATION GOALS
 
 
 50
 Here again it is for the district court to determine whether the adoption of a timetable is a worthwhile step in dealing with the myriad problems of desegregating the Wilcox County School system. On the basis of the present record, we are not convinced that the district court is unwilling or unable to require compliance with the time-urgency mandate of Alexander v. Holmes County, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). We decline to require the adoption of such a timetable.
 
 STUDENT FEES
 
 51
 The present record is without evidence indicating that students are being assessed fees for the 1973-74 school year. Such assessments were specifically enjoined by the district court's order of October 5, 1972. Paragraph 12 of the order of September 26, 1973 requiring the School Board to provide janitorial service, does not provide for the collection of any student fees and none may be collected. The assessment of any course fees except those which have been traditional with this school system, was enjoined by the consent decree of October 5, 1972. The terms of that order are correct and are sufficient to cover the claims advanced here. Any asserted violations should be considered by the court below.
 
 
 52
 COMPLETE IMPLEMENTATION OF TITLE IV CENTER PLANS AND APPOINTMENT OF A RECEIVER
 
 
 53
 We do not interpret the district court's order of September 26, 1973 to require any less than the fullest possible implementation of the Title IV Center plan (except as discussed first above) which the financial resources of the county and system will permit. Plan implementation is made the standard for School Board compliance with the spirit of the court's decree. The desirability of further specific relief as to particular portions of the plan should be addressed to the court below. The record does not demonstrate any inability of the district court to discharge its judicial functions in this cause without the assistance of supporting personnel in the form of a receiver or some type of special master. No finding to this effect has been made. Until that court considers and decides the issue, any directive by this court to take such action would be premature.
 
 
 54
 FAILURE TO MAKE FINDINGS OF FACT AND CONCLUSIONS OF LAW
 
 
 55
 The January 10, 1972 mandate of this court directed the district court to supplement the record in this case with findings of fact and conclusions of law as to whether maintenance and equipment were being handled by the district on a non-discriminatory basis, whether student expulsions and suspensions and textbook distribution were non-discriminatory, whether the School Board had discriminated in discharging, hiring or promotion of faculty or staff, and the manner in which actual pupil results under the court's plan compared with the attendance projected under the plan initially submitted by the Department of Health, Education and Welfare. While some of these areas are now moot, there does appear to be a desirability, if not a necessity, for the court to enter findings and conclusions as to some of these areas and others discussed on the present appeal. An order by the district court making specific fact determinations on the issues now pending should be made to provide for this cause the bench marks essential to charging a course which will bring this litigation to the most prompt, just determination possible.[3]
 
 
 56
 DIRECTIONS TO THE DEFENDANT, ALABAMA STATE DEPARTMENT OF EDUCATION TO PROVIDE PROFESSIONAL AND ECONOMIC ASSISTANCE TO THE WILCOX COUNTY SCHOOL BOARD
 
 
 57
 In its order of October 5, 1972 the court ordered the State department of Education to assist the School Board as to matters of accreditation. In its order of May 15, 1973 the State Board and the State Superintendent of Education were ordered to comment on the educational desirability of the Health, Education and Welfare plan and to recommend alternatives. The order of September 26 enjoins all parties to seek outside financial assistance and to assist the Board with other financially related efforts. The Board has taken the position that its direct financial involvement is limited by Alabama law to allocation of funds based upon average daily attendance and that it has no authority to make 'a special case' of Wilcox County. Without prejudice to further consideration of the need for specific relief of this type, we decline to require action in this regard now.
 
 
 58
 The order appealed from is in part affirmed, in part reversed, and the cause is remanded for further consideration not inconsistent with this order.
 
 
 59
 Affirmed, in part; reversed, in part; and remanded.
 
 
 
 [1]
 The school by school enrollment is as follows:
 Non-White White
 --------- -----
ALBERTA (B) 120 0
BOYKIN (B) 178 0
CAMDEN ACADEMY
 (GRADES 1-6) (B) 310 0
CAMDEN ACADEMY
 (GRADES 7-12) (B) 646 0
MOORE ACADEMY
 (W) 365 1
PINE HILL CONSOLIDATED
 (GRADES 1-4) (B) 361 2
PINE HILL CONSOLIDATED
 (GRADES 5-8) (B) 395 1
PINE HILL HIGH
 SCHOOL (W) 345 0
TATES CHAPEL
 SCHOOL (B) 174 0
WILCOX COUNTY
 SCHOOL (W) 466 105
WILCOX COUNTY
 TRAINING
 SCHOOL (B) 177 0
WILLIAM J. JONES
 HIGH SCHOOL (B) 196 0
 --------- -----
 TOTAL-- 3733 109
 (B) Formerly all-black school
 (W) Formerly all-white school
 (B) Formerly all-black school
 (W) Formerly all-white school
 
 
 [2]
 No decision of this court requires that the teachers in any system or at any school be maintained at any arbitrary racial ratio. Singleton contemplates an initial reassignment so that the racial ratio at every school reflects the systemwide ratio, followed by the utilization of a non-discriminatory hiring, firing and assignment policy thereafter. See, e.g., Carter v. West Feliciana Parish School Board, 432 F.2d 875 (5th Cir. 1970)
 
 
 [3]
 The United States proposed findings of fact and conclusions of law to the court below and such findings do not appear to have been challenged. Whether all or any portion of these findings are to be used is of course for the district court to determine initially